Filed 11/21/14

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT GARDNER,<br><br>　　　　Defendant and Appellant. | A135615<br><br>(Contra Costa County<br>Super. Ct. No. 51006220) |

A jury convicted defendant Robert Gardner of first degree murder (Pen. Code,[1] § 187), torture (§ 206), first degree burglary (§§ 459, 460, subd. (a)), and grand theft (§ 487). The trial court further found true the allegations that defendant had served two prior prison terms (Veh. Code, § 10851; § 667.5). The trial court sentenced defendant to 29 years to life for the first degree murder count, a consecutive 16-month term for the burglary count, and a consecutive eight-month term for the grand theft count. Additionally, the court imposed a life term for the torture count, but stayed punishment under section 654.

On appeal, defendant claims *Faretta*[2] error and a prejudicial delay in arraignment require reversal. He further argues that his eight-month sentence for grand theft must be stayed pursuant to section 654; the Attorney General concedes this error. Finding no

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II.B. and C. of the Discussion.

[1] All further statutory references are to the Penal Code unless otherwise designated.

[2] *Faretta v. California* (1975) 422 U.S. 806.

reversible error, we affirm the judgment.  A limited remand is required, however, to correct the conceded sentencing error.

## I.  EVIDENCE AT TRIAL

### A.  *Residential Burglary, Gun Theft, and Murder*

Jimmy Bean, Jr., testified that in November 2009 he suspected his son, Eric Bean, was taking drugs.  On December 17, 2009, Bean discovered that someone broke into his gun safe and took three shotguns and a Ruger pistol.  Bean's gun safe had been pried open.  The responding police officer noted that the front and back doors of Bean's residence showed no signs of forced entry.  The officer also observed tool marks on a gun safe and took latent print samples from the front of the safe.

Four days later, on the morning of December 21, 2009, Eric Bean's body was discovered by a bicyclist along McEwen Road in Contra Costa County.  His body was in rigor mortis, indicating that he had been dead for several hours.  It appeared that Eric had been tied and beaten; his wrists, ankles, and neck bore ligature marks and there were many lacerations, abrasions, and contusions about his face and head.  His T-shirt was blood stained, though no blood was found on the ground, suggesting that Eric had been murdered at another location.  It was later determined that Eric had been murdered at 100 Carolina Drive in Benicia, the known residence of defendant's confederate Timothy Delosreyes, Jr. ("Big Tim").

### B.  *Forensic Evidence*

Crime lab analyst Catherine Currier testified that she observed a "large cut" on Eric's head, a wound on the chin, and bruises to the right elbow and foot.  Currier observed ligature marks to the victim's wrists and ankles. Currier observed a shoe print on the victim's left buttock.  Currier opined that the victim died at another location due to the lack of blood pooling, spatter, or shoe prints around the body.  On March 9, 2010, Currier tested defendant's white pickup truck for blood evidence.  An area under the bed liner and the frame under the tailgate tested positive for blood.  Currier found yellow rope in the truck bed.

2

Crime lab analyst Richard Bowden found 0.02 micrograms per milliliter of amphetamine and 0.07 micrograms per milliliter of methamphetamine in Eric's blood.

Criminalist Donald Finley found three blue fibers on Eric's boxers, a yellow fiber on the body's right leg, and various fibers on an outer T-shirt.

Pathologist Arnold Josselson found numerous abrasions on the body's right ankle, right shoulder, penis, right elbow, lower right abdominal wall, right thigh, left forearm, upper abdomen, left hip, right ear, both cheeks, forehead, nose, and upper lip. There were bruises on the feet, right back, upper left arm, right knee, left hip, eyelids, nose, left knee, and left shoulder. There were lacerations to the left eyebrow, on the chin, right ear, lower lip, and on the right corner of the mouth. There was a ligature abrasion across the lower neck, several smaller ligature impressions on the front of the neck, and ligature marks on the left ankle and each wrist. One tooth was chipped. There was hemorrhaging on the surface of the brain, blood inside the brain, on the left side of the neck, on the soft tissue of the voicebox and the larynx, and on the soft tissue overlying the spinal column in the neck. Josselson opined that Eric died from strangulation and from blunt force injury to the head. Josselson noted that Eric had blood in his stomach and airway.

Criminalist Alex Taflya examined the residence at 100 Carolina Drive in Benicia. The northeast bedroom showed signs of sloppy application of wall paint. Two stains on the north wall were presumptively positive for blood.

Latent print analyst Stephanie Souza examined the latent prints taken from the gun safe and found that one print was from defendant's right thumb and another from defendant's right middle finger. Eric's left thumb made two latent prints on the safe.

Criminalist Kim Willey examined blood samples taken from the northeast bedroom of 100 Carolina Drive. The DNA profile of that blood sample matched Eric's DNA profile.

## C.     *Defendant's Statements to Police*

### 1.     *December 30, 2009*

Deputy Sheriff Michael Meth first questioned defendant on December 30, 2009. Defendant said that on December 20 and December 21, he was working at a construction project in San Francisco. Defendant said he was in San Francisco with "Little Tim" Delosreyes (Timothy Delosreyes III, also called "Timmy"). When told that his cell phone records did not corroborate his presence in San Francisco, defendant had no explanation. Defendant denied knowing about Eric's whereabouts or death. Defendant said that Big Tim and Little Tim Delosreyes were his longtime friends. Defendant last saw Eric during the week of December 14, 2009.

### 2.     *March 6, 2010*

Sheriff's Sergeant Garrett Schiro testified that on March 6, 2010, he obtained arrest warrants for defendant, Big Tim, Timmy, and defendant's wife, Melody Rives. That same day, defendant led investigators on a tour through the residence at 100 Carolina Drive in Benicia. The jury was shown a video depicting defendant's tour.[3] Defendant told Deputy Meth that he believed he was being helpful or positive in advising Timmy on how not to get caught. He described the rope used to tie up Eric as " 'half inch yellow rope.' " Defendant reported that Eric had been gagged while being held captive in the bedroom. He acknowledged that he could have saved Eric's life.

Defendant said that on Saturday, December 19, 2009, he and Big Tim spent the night in Vallejo. Then, on Sunday morning about 8:30 a.m., defendant received a telephone call from his wife, followed by another call from Timmy. Defendant left Vallejo and drove to 100 Carolina Drive in Benicia. Eric was in a bedroom, beaten and hog-tied.

Defendant estimated that Eric died about 10:30 to 11:00 a.m. that Sunday. Defendant said that Eric and Timmy had stolen some guns. Melody told defendant that

---

[3]     On our own motion, we have augmented the record on appeal to include the video-recording of defendant's tour of the crime scene. We have watched the recording and have read the corresponding transcript.

4

Eric was going to "squeal." Defendant said that Eric was tied up with half-inch yellow rope. Defendant saw Big Tim throw a drinking glass at Eric, and heard Eric moan after being struck. After Eric's death, Big Tim left the house and went to drug rehab.

Defendant said that he and Timmy carried the body to defendant's truck bed for disposal. Defendant and Timmy wrapped the body in a blanket that was later discarded at the Nob Hill grocery store dumpster. Defendant wore latex gloves during the disposal of the body. Defendant estimated that the dead body was in the Benicia residence for about seven and a half hours.

Defendant said Timmy cleaned the house with bleach for nine hours. Defendant inspected the work and told Timmy he had more spots to clean.

### 3. *March 10, 2010*

On March 10, 2010, Sergeant Schiro interviewed defendant at the Martinez Detention Facility. That interview was videotaped and a redacted portion of the recording was played for the jury.[4] Defendant said he helped Eric and Timmy retrieve the guns from the gun safe about a week before Eric's death. Defendant explained that on Saturday, December 19, 2009, he was with Big Tim in Vallejo, getting high at someone's residence. By phone contact the next morning, Timmy said he needed help and asked defendant to come back to the house in Benicia. On arriving at the Benicia residence, Melody told defendant that Eric was going to "snitch" to his father about the stolen guns.

Defendant said that when he arrived at the Benicia residence, Eric was hog-tied but not beaten. Timmy told Eric to shut up and pushed a homemade "metal sticker" in the areas under Eric's chin. Melody told defendant that Eric was "going to dip" or "leave." Defendant left the residence to buy lunch for everyone. He denied punching, kicking, or spitting on Eric. Defendant instructed Timmy that Eric's bindings had

---

[4]     On our own motion, we have augmented the record on appeal to include the video-recording of defendant's interview at the police station. We have watched the recording and have read the corresponding transcript.

loosened during the assault. He told Timmy, "[O]nce somebody's hog-tied, you can't let them go." Defendant said he wanted Eric to die "smoothly" and not suffer.

Defendant saw Timmy grab a 24-inch sword, place it in Eric's mouth, and move it horizontally in Eric's mouth. Defendant said the stolen guns were already in "third or fourth hands by now." Defendant allowed Timmy to live at his residence for two weeks after Eric's death. Defendant said he drove the body in his truck and pulled off the side of the roadway. Timmy went to the back of the truck and rolled the body out of the truck bed and down the hill.

### D. Defense Case

Melody Rives testified that she married defendant on September 12, 2009. In October 2009, Big Tim resided at Carolina Drive in Benicia. In December 2009, Melody began using methamphetamine. On December 15, 2009, at 1:00 or 2:00 a.m., Timmy called Melody from the Martinez Amtrak station and asked her to give him and Eric a ride. Melody estimated defendant was drunk four to five times a week and was not available to drive Timmy or Eric. Melody picked up Eric, who appeared "high" on drugs. She saw Timmy using a handmade weapon with a sharp point. The weapon had a handle wrapped in tape.

On December 17, 2009, Melody saw defendant leave about 5:00 a.m. Defendant returned to the Carolina Drive house with Timmy, who was carrying a blanket with three shotguns and a .22 revolver. Big Tim was away from the residence from December 16 through December 18.

On December 19, 2009, about 6:00 p.m., Melody was at the Carolina Drive residence with defendant, Eric, Big Tim, and Timmy. At 11:00 p.m., defendant and Big Tim left the residence. At 1:00 a.m., Timmy and Eric were inside Timmy's bedroom smoking methamphetamine. Later that morning, Timmy woke Melody and asked her to come into the bedroom to talk to Eric. Eric was "zip-tied" on the bed, covered by a blanket. The next morning, defendant came back to the residence with Big Tim.

6

At 3:00 p.m., Melody became concerned for Eric, having last seen him six or seven hours prior. She slightly opened the bedroom door, but Timmy pulled the door shut "real fast." Melody never saw defendant enter that bedroom. At 3:30 or 4:00 p.m., Melody was sitting on the couch and heard "scuffling noises, banging noises" coming from the bedroom. She saw Big Tim enter the bedroom. She saw Big Tim throw a glass into the bedroom and heard the glass break. Big Tim left the residence thereafter. Defendant escorted her outside. Outside, Melody heard "heavy noises" coming from inside the residence. After five minutes, there were no more noises. At one point, Melody saw Timmy carrying rope.

At 5:00 or 5:30 p.m., Melody returned to the residence and saw defendant "extremely upset" and sitting in the dining room, and noted that Timmy was taking a shower. In the late afternoon, Melody was "scared to death," having learned Eric was dead.[5] At 6:00 p.m., Big Tim returned to the residence with cleaning supplies. Melody cleaned up a latent fingerprint on the bedroom door and a "few spots" on the mattress and put wet clothing into the dryer. Bloody clothes had been placed into bags and put inside the garage. Timmy was moving the bags around in the garage and painting the bedroom wall. In the morning hours of December 21, Melody saw defendant and Timmy drive away from the Carolina Drive residence.

### E.    *Rebuttal*

On December 29, 2009, Sheriff's Sergeant Tiffany Van Hook contacted Melody at her residence in Benicia. Melody said she last saw Eric and Timmy on Friday, December 18, 2009. She gave both men a ride to a park in Martinez. She said she next saw Timmy at the candlelight vigil for Eric.

On March 6, 2010, Sergeant Van Hook contacted Melody. Melody said that on Saturday, December 19, she was at the Carolina Drive residence with defendant, Timmy, and Big Tim. Melody said that Eric was not at the house. She said that Timmy disposed

---

[5]    Melody waived her spousal privilege and entered into a plea bargain with the district attorney that promised a grant of probation for truthful testimony and a conviction for being an accessory after the fact.

of the body.  Melody later said defendant and Timmy disposed of the body.  She did not know the motive for the killing.  Eric feared that Timmy believed that he would snitch about the stolen guns.

On March 10, 2010, Sergeant Van Hook again spoke with Melody.  In that conversation, Melody said she burned a phone book inside a "pot belly stove."  Melody said that Eric was present at the Carolina Drive residence with Timmy and herself.  Eric told her he was not going to snitch on anyone.

After the killing, Melody saw defendant and Timmy cleaning up.  On Sunday, Melody told Big Tim that Timmy feared Eric was going to snitch on them all.  Melody feared Eric would implicate defendant about the stolen guns.  Melody saw that the shotguns were now sawed off, making them shorter in length.  Defendant delivered the shotguns to someone named "Butters" in Concord.  Melody saw defendant tighten the restraints used on Eric.  Big Tim told defendant to tighten the restraints because Timmy did not know what he was doing.

## II.  DISCUSSION

### A.    *Self-Representation*

Defendant contends the trial court committed reversible error when it denied his request for self-representation.  Citing *People v. Johnson* (2012) 53 Cal.4th 519 (*Johnson*), defendant argues that the trial court's justifications for denying his *Faretta* motion did not constitute substantial evidence of defendant's incompetence.  Therefore, defendant argues, the error is reversible per se, and the judgment must be reversed.  We disagree.

#### 1.    *Background*

The trial court heard defendant's motion to discharge appointed counsel and to represent himself on May 4, 2011, 10 months before trial commenced on March 12, 2012.  Defense counsel informed the court that she had doubts about defendant's competence to stand trial.  The trial court immediately suspended the criminal

proceedings and appointed Jessica Ferranti, M.D., to evaluate defendant's competence to stand trial and to represent himself.

Two months later, the parties waived a trial on competence and submitted the issues to the court based on Dr. Ferranti's written report. In her July 18, 2011, report, Dr. Ferranti stated that she conducted a psychiatric exam on defendant, including a two-and-three-quarter-hour interview, two quantitative tests, and a review of relevant records. Dr. Ferranti stated that defendant's "current diagnosis is Alcohol Abuse, Amphetamine Dependence, Antisocial Personality Disorder and Expressive Language Disorder." She opined that appellant was competent to stand trial. Dr. Ferranti considered several factors, including that defendant (1) "demonstrated excellent knowledge of legal terms" but "was impaired in his ability to string them together articulately in an effective and articulate presentation"; (2) "had an adequate understanding of the roles of various courtroom participants and the role of his attorney"; (3) "exhibited a fair understanding of the nature of the proceedings against him"; (4) "demonstrated awareness of evidence against him although he maintained that said evidence should be 'inadmissible' because of what he perceives as police protocol violations"; (5) "expressed his general understanding of his charges"; and (6) "performed very well on a formal assessment instrument," scoring 92 out of 100 points on a test designed to assess an accused's competency to stand trial.

Based on the enumerated factors, Dr. Ferranti opined, with reasonable medical certainty, "that [defendant] . . . ha[d] the ability[ ] to assist counsel in a rational manner, should he choose to do so" (italics omitted). In support of this conclusion, Dr. Ferranti noted that defendant did "not have any thought process impairments or psychotic symptoms that would prevent him from engaging rationally with an attorney." She further noted that although defendant "struggled with expressing himself," he "ultimately was able" to do so with her "clarifications." Dr. Ferranti also reported that defendant "was able to provide a cogent and consistent account of the events on the day of his arrest," and he "demonstrated the ability to engage in strategizing and future-planning."

9

Dr. Ferranti, however, opined "with reasonable medical certainty" that defendant was not competent to represent himself. She based her opinion on various factors, including defendant's expressive language disorder, which prevented him from being able to "communicate coherently enough to make presentation[s] to the Court." She further opined that defendant would "not be able to communicate with the Court or a jury with sufficient clarity to make himself understood in real time during trial." As a result, she found it likely that defendant "would be significantly disadvantaged due to his mental impairment."

Dr. Ferranti further opined that "due to the significant amount of time required for [defendant] to express himself and for his audience to get clarification on his remarks that the essential principles of fairness to the defendant and efficiency for the State of California in trying him for serious crimes, would both be at risk by allowing this defendant to represent himself." Accordingly, she concluded that defendant was "mentally impaired to the extent that the basic integrity of the proceeding would be . . . jeopardized by going forward with adjudication with him as pro per."

In reaching this conclusion, Dr. Ferranti explained as follows: "Communication in court requires that decisions be made quickly and sometimes under pressure. Decisions facing defendants representing themselves include all the basic strategic and tactical choices of trial, such as what motions to make, what witnesses to call, and what arguments to make to the jury. [Defendant] clearly lacks the ability to communicate clearly. In addition, [defendant] demonstrates a lack of ability to incorporate new ideas (learn) and adapt strategically. . . . Lack of ability to foresee possible outcomes and shift one's basic defensive strategy is an important basic competency for the pro per defendant. [Defendant] lacks this ability."

Dr. Ferranti further explained that although she thought defendant "is competent to waive his right to counsel and understand the potential risks and benefits of doing so, he does not demonstrate the higher cognitive abilities necessary to litigate his case in court. Although [defendant] does not meet criteria for mental retardation or borderline intellectual functioning, his intelligence is limited. He does not exhibit the ability for

10

abstract thinking, higher level problem solving or cognitive flexibility. His ability to be educable and process information is limited."

Based on Dr. Ferranti's report, the trial court found defendant competent to stand trial on July 20, 2011. Defense counsel noted her agreement with Dr. Ferranti's conclusion that defendant was competent to stand trial but not competent to represent himself. Defense counsel also advised the court that defendant would like to substitute counsel. After holding a *Marsden*[6] hearing, the court denied defendant's request for substitute counsel. The court did not expressly rule on defendant's *Faretta* motion.

On January 19, 2012, two months before trial began, the court heard a defense motion to continue the trial. At this hearing, defense counsel informed the court that defendant would like to represent himself. After agreeing to waive time for trial, defendant stated that he "would like to go *Faretta*." The following colloquy occurred: "THE COURT: It's my understanding from your attorney that you have been evaluated and the doctor felt that you had difficulty understanding the complexity of putting on a trial, as to whether or not you were competent to represent yourself. [¶] This doctor, Dr. Ferante [*sic*], made the assessment that you would not be able to litigate your case in court because of the cognitive disabilities you have—meaning higher processes—not that you can't understand what is going on, but it's more complicated. Do you understand? [¶] THE DEFENDANT: I feel I can do it now because this case is two years old; and I've been preparing, doing my own litigating within my cell and stuff like that. I got a couple of motions that I already prepared, already ready to go out. And I don't see why it's an issue. [¶] THE COURT: Well I did re-read Dr. Ferante's [*sic*] evaluation; and based on my assessment of that and [defense counsel's] interaction with you, I am finding that your mental state is about the same as when Dr. Ferante [*sic*] evaluated you. So I am denying your *Faretta*."

---

6      *People v. Marsden* (1970) 2 Cal.3d 118.

## 2. *Applicable Law*

A trial court must allow a defendant to represent himself if he knowingly and intelligently makes an unequivocal and timely request. (*Faretta, supra,* 422 U.S. at pp. 835–836; *People v. Valdez* (2004) 32 Cal.4th 73, 97–98.) The right of self-representation, however, is not absolute. (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 (*Edwards*).) Indeed, in *Edwards* the United States Supreme Court held that courts may limit a defendant's self-representation right by insisting upon representation by counsel at trial on the ground that the defendant lacks the mental capacity to conduct his defense unless represented. (*Edwards, supra,* 554 U.S. at p. 178.) "That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Ibid.*) "*Edwards* described competence to represent oneself at trial as the ability 'to carry out the basic tasks needed to present [one's] own defense without the help of counsel.' " (*People v. Johnson* (2012) 53 Cal.4th 519, 530 (*Johnson*), quoting *Edwards, supra,* 554 U.S. at pp. 175–176.)

Before *Edwards,* California courts held that a defendant who was competent to stand trial was competent to represent himself under *Faretta.* (See *Johnson, supra,* 53 Cal.4th at p. 527.) In *Johnson,* the California Supreme Court adopted the limitation on self-representation authorized by *Edwards,* but declined to adopt a more specific standard. (*Id.* at p. 530.) In so holding, *Johnson* explained that the appropriate standard for trial courts to use in deciding whether to exercise their discretion to deny self-representation "is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Ibid.*)

In other words, California courts have discretion to deny self-representation to so-called gray-area defendants—those who are mentally competent to stand trial if represented by counsel but not mentally competent to conduct the trial themselves—"in those cases where *Edwards* permits such denial." (*Johnson, supra,* 53 Cal.4th at p. 528;

12

see *Edwards, supra,* 554 U.S. at pp. 172–174 [discussing gray-area defendants].) Nevertheless, our Supreme Court has cautioned that "[s]elf-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly." (*Johnson,* at p. 531.)

"As with other determinations regarding self-representation, we must defer largely to the trial court's discretion." (*Johnson, supra,* 53 Cal.4th at p. 531.) The trial court's ruling regarding a defendant's competence will be upheld if supported by substantial evidence. (*Ibid*.) "*Faretta* error is reversible per se." (*People v. Valdez, supra,* 32 Cal.4th at p. 98.)

### 3. *No Abuse of Discretion*

We believe that the trial court correctly applied *Edwards* to the circumstances of defendant's case, and there was no abuse of discretion. *Johnson*, which was decided after defendant's self-representation request, serves to bolster our conclusion that the trial court properly denied defendant's *Faretta* motion. Defendant relies heavily on the fact that he was not delusional or psychotic, that he achieved top scores on tests designed to assess his competency to stand trial, and that he was believed to be of average intelligence. Because the rationale of *Edwards* is at the heart of the issue in this case, we believe further analysis of *Edwards* and *Johnson* is required.

In *Edwards,* the United States Supreme Court stated that its precedents did not answer the question whether the federal Constitution prohibits a state from insisting that a defendant proceed to trial with counsel (and denying the defendant the right to represent himself) when the state court finds the defendant mentally competent to stand trial if represented, but not mentally competent to conduct the trial himself. (*Edwards, supra,* 554 U.S. at pp. 167, 169.) The court explained that the chief precedents on the standard for mental competency (*Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*) and *Drope v. Missouri* (1975) 420 U.S. 162) did not consider the relation of the mental competence standard to the right of self-representation. (*Edwards, supra,* 554 U.S. at pp. 169–170.) *Faretta* also did not answer the question both because it did not consider the problem of

mental competency, and because *Faretta* itself and later cases made clear that the right of self-representation is not absolute. (*Edwards,* at pp. 170–171.) Similarly, *Godinez v. Moran* (1993) 509 U.S. 389 (*Godinez*) did not answer the question. (*Edwards,* at p. 173.) The court recognized that its emphasis in *Godinez* on the need to consider only the defendant's " 'competence to *waive the right*' " and the absence of the need to consider the defendant's " 'technical legal knowledge' " about how to conduct a trial stemmed from the fact that the *Godinez* defendant sought only to change his pleas to guilty, not to conduct trial proceedings. (*Ibid.*) Moreover, *Godinez* held only that a state may *permit* a gray-area defendant to represent himself. It did not tell a state whether it might *deny* the same type of defendant the right to represent himself, which was at issue in *Edwards*. (*Ibid.*)

The consideration of various factors, taken together, led the *Edwards* court to hold that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards, supra,* 554 U.S. at p. 178.)

In explaining its rationale, *Edwards* first observed that the court's " 'mental competency' " cases focused upon a defendant's ability to consult with his attorney and *assumed* representation by counsel, which suggested that, when such a defendant sought to forgo counsel, it called for a different standard. (*Edwards, supra,* 554 U.S. at pp. 174–175.) The court pointed out that *Faretta* itself "rested its conclusion in part upon pre-existing state law set forth in cases all of which are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right." (*Id.* at p. 175.)

Secondly, the complex nature of mental illness and mental competency, with its tendency to vary in degree and over time as well as in its effect on the individual, cautions against employing the same standard for determining whether a represented defendant can stand trial and whether a defendant must be allowed to represent himself at trial. (*Edwards, supra,* 554 U.S. at p. 175.)

Third, allowing a defendant with an uncertain mental state to represent himself would not affirm the dignity and autonomy of the individual, which are the underpinnings of the right to represent oneself. (*Edwards, supra,* 554 U.S. at p. 176.)

The *Edwards* court also observed that self-representation by a defendant who lacked the capacity to do so would "undercut[ ] the most basic of the Constitution's criminal law objectives, providing a fair trial." (*Edwards, supra,* 554 U.S. at pp. 176–177.) Moreover, the trial must not only be fair, its fairness must be apparent to all. (*Id.* at p. 177.) The *Edwards* court determined that there was little reason to believe that application of *Dusky*'s basic mental competence standard was sufficient. (*Ibid.*) The court believed that the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." (*Ibid.*) Consequently, the court concluded that "the Constitution permits judges to take *realistic account* of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." (*Id.* at pp. 177–178 (italics added).) In reaching this conclusion, the *Edwards* court cited with approval the amicus brief by the American Psychiatric Association (APA), which stated that " '[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illness can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant.' " (*Id.* at p. 176.)

In *Johnson,* the California Supreme Court decided that California courts may "accept [the] invitation" extended by *Edwards* and "apply a higher standard of mental competence for self-representation than for competency to stand trial." (*Johnson, supra,* 53 Cal.4th at p. 523.) The court stated that, "[b]ecause California law—which, of course, is subject to the United States Constitution—has long been that criminal defendants have *no* right of self-representation, . . . California courts may deny self-representation when the United States Constitution permits such denial. (*Ibid.*) The standard trial courts should apply when deciding whether to exercise their discretion to deny self-

15

representation is "whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id*. at p. 530.) Trial courts may order a psychological or psychiatric examination to inquire into the issue of doubts about the defendant's mental competence for self-representation. (*Ibid*.) In addition, the judge's own observations will also provide support for an incompetence finding. (*Id*. at p. 531.)

In the instant case, unlike in *Edwards* and *Johnson*, we do not have a defendant who wrote and presented the court with "bizarre" documents. (See *Edwards, supra,* 554 U.S. at pp. 176, 179; *Johnson, supra,* 53 Cal.4th at pp. 532–533 & fn. 2.) We do not have a record of bizarre or disruptive behavior in the courtroom. (See *Johnson,* at p. 525.) Nor do we have the convenience of a finding by the instant trial court like the one made by the trial court in *Johnson,* which employs nearly the exact wording of the amicus brief by the APA quoted in *Edwards*.[7]

We nevertheless have sufficient substantial evidence to uphold the trial court's denial of defendant's *Faretta* motion, although the evidence differs from that of *Edwards* and *Johnson*. Substantial evidence is "evidence that is reasonable, credible, and of solid value . . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Here, the trial court considered Dr. Ferranti's report, which determined with "reasonable medical certainty" that defendant was incompetent to represent himself at trial. In her report, Dr. Ferranti echoed the sentiments of the APA amicus brief, noting

---

[7] In *Johnson, supra,* 53 Cal.4th at p. 525, the trial court found the defendant suffered from " 'disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety and other common symptoms of severe mental illnesses which can impair his ability to play the significantly expanded role required for self-representation, even if he can play the lesser role of a represented defendant.' "

that defendant suffered from an "Expressive Language Disorder" that prevented him from coherently communicating with the court or a jury. Dr. Ferranti also reported that defendant did not demonstrate "the higher cognitive abilities necessary to litigate his case in court." In other words, defendant did not have the " 'ability to play the significantly expanded role required for self-representation even if he [could] play the lesser role of represented defendant.' " (*Edwards, supra,* 554 U.S. at p. 176.)

On this record, allowing defendant to represent himself would have undercut "the most basic of the Constitution's criminal law objectives," that is, the providing of a fair trial. (See *Edwards, supra,* 554 U.S. at pp. 176–177.) As its comments indicated, the trial court clearly believed that defendant, due to his mental illness, was not capable of carrying out the basic tasks required to present a defense—tasks such as organizing a defense, making motions, and questioning witnesses. (See *Edwards,* at p. 176; *Johnson, supra,* 53 Cal.4th at p. 530.) Because defendant was not obstreperous in court and otherwise lucid in his demeanor, the trial court's decision here was of necessity more finely tuned. (See *Edwards,* at p. 177.) There is absolutely no indication that the trial court denied defendant's *Faretta* motion for reasons of efficiency or merely to level the playing field. (See *Johnson,* at p. 531.) The trial court obtained expert evaluation, as urged by *Johnson* (*id.* at p. 530), and relied on that evaluation, as well as considered defense counsel's concerns. We will not second-guess that decision. (See *Edwards,* at p. 177 [a "trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant"].) We conclude that the trial court did not abuse its discretion in denying defendant's motion to represent himself.

**B.     *Delay in Arraignment**[*]*

Defendant claims that the trial court erred in failing to suppress his March 10, 2010, statement due to an unreasonable delay in arraignment. We disagree.

---

[*]     See footnote *ante*, page 1.

Defendant was arrested on Saturday morning (March 6, 2010) but was not arraigned until Wednesday afternoon (March 10, 2010). Defendant urges that he should have been taken before a magistrate on Wednesday *morning* and, therefore, the statements taken from him on Wednesday morning should have been excluded as the fruits of an illegal detention.

"Persons in custody must be arraigned without unnecessary delay. (Cal. Const., art. I, § 14; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56–57 [probable cause determination ordinarily should occur within 48 hours of a warrantless arrest]; . . . *People v. Hughes* (2002) 27 Cal.4th 287, 325.)" (*People v. Williams* (2010) 49 Cal.4th 405, 446.) Section 825, subdivision (a) states: "(1) Except as provided in paragraph (2), the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays. [¶] (2) When the 48 hours prescribed by paragraph (1) expire at a time when the court in which the magistrate is sitting is not in session, that time shall be extended to include the duration of the next court session on the judicial day immediately following. If the 48-hour period expires at a time when the court in which the magistrate is sitting is in session, the arraignment may take place at any time during that session. However, when the defendant's arrest occurs on a Wednesday after the conclusion of the day's court session, and if the Wednesday is not a court holiday, the defendant shall be taken before the magistrate not later than the following Friday, if the Friday is not a court holiday."

In the instant case, since "Saturdays and Sundays [are] judicial holidays, . . . the statutory two-day period did not commence until Monday and did not expire until midnight Tuesday. Courts not being in session at midnight, arraignment on Wednesday did not exceed the statutory maximum provided by section 825 . . . . [Citations.]" (*People v. Lee* (1970) 3 Cal.App.3d 514, 521, fn. omitted.) Thus, the statements taken on Wednesday morning were obtained within the two-day statutory maximum. To the extent defendant insists that he should have been arraigned on Wednesday *morning* instead of the afternoon, the record is silent regarding whether the magistrate was available for a morning session.

18

Nevertheless, "[u]nder certain circumstances even a delay within the statutory maximum may be patently unreasonable. . . . This is not such a case." (*People v. Lee, supra,* 3 Cal.App.3d at pp. 521–522.) Here, the claimed delay was at most three hours. Given the practical realities of the overburdened court system, combined with the fact the police were investigating a brutal torture-murder case with several possible suspects, the three-hour delay was not unreasonable.

Even assuming, arguendo, that the delay was unreasonable, it does not follow that the statements were inadmissible. "A delay in arraignment is treated 'as only one of the factors to be considered in determining whether the statement was voluntarily made.' [Citations.] To exclude the statement, the defendant must show that 'the illegal detention produced the admissions' or that there was an 'essential connection between the illegal detention and the confession.' [Citations.]" (*People v. Thompson* (1980) 27 Cal.3d 303, 329–330, overruled on another point in *People v. Rowland* (1992) 4 Cal.4th 238, 260.)

In the instant case, there is no suggestion that defendant's statements were involuntary under the *Miranda*[8] rules or in the traditional sense. The record discloses that defendant was properly advised of his rights and he voluntarily, knowingly, and intelligently waived them. Defendant offers nothing to support his contention that his statements were coerced. Rather, he speculates that he was "likely experiencing symptoms" of his methamphetamine addiction at the time he made his statements. He further claims that he is a "man of limited intelligence" and "the sole purpose" of the "unnecessarily long delay" was to "extract a confession." There is no evidence, however, that defendant's March 10, 2010, statement was caused by any prolonged, or otherwise improper, interrogation tactics or attributable to any withdrawal symptoms. Rather, the record reflects that defendant previously gave statements on two prior occasions, each time providing limited information about the crime. It was only after he learned that the police had been talking to his confederates, including his wife, that he decided to confess his involvement in the crime.

---

[8]     *Miranda v. Arizona* (1966) 384 U.S. 436.

We conclude that the statements taken from defendant on March 10, 2010, were voluntary and properly admitted into evidence.

## C.    *Sentencing*[*]

Finally, defendant argues that the trial court erred in imposing a consecutive eight-month term on count four, the grand theft, because that offense stemmed from the same conduct in count three, the burglary, which was punished under section 459. He asserts that the court should have stayed the eight-month term pursuant to section 654. The Attorney General concedes the error, noting that the grand theft and burglary occurred with one intent and objective, namely, theft of the guns. Accepting this concession, we agree that the eight-month consecutive sentence should be stayed pursuant to section 654.

## III.  DISPOSITION

The judgment is modified to reflect that the sentence on count four is stayed pursuant to section 654. The trial court is ordered to issue an amended abstract of judgment reflecting this modification, and to forward a copy of the amended abstract to the Department of Corrections. As so modified, the judgment is affirmed.

---

[*]      See footnote *ante*, page 1.

20

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
HUMES, J.*


* Presiding Justice of the Court of Appeal, First Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Lewis A. Davis |
| Attorneys for Plaintiff and Respondent: | Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Laurence K. Sullivan, Deputy Attorney General René A. Chacón, Deputy Attorney General |
| Attorney for Defendant and Appellant: | Robert Derham, under appointment by the Court of Appeal |