Filed 10/10/25  P. v. Munoz CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RUBEN LUIS MUNOZ,<br><br>Defendant and Appellant. | B341710<br><br>(Los Angeles County<br> Super. Ct. No. 24WCCF00405) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David C. Brougham, Judge.  Affirmed.

Law Offices of Andy Miri and Andy Miri for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, Shezad H. Thakor, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Ruben Luis Munoz appeals from the judgment after a jury convicted him on three counts of assault with a deadly weapon and one misdemeanor count of illegally using tear gas. Munoz argues the trial court erred in granting his motion under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to represent himself. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Munoz Attacks a Family Acquaintance and Several Family Members*

Munoz and his mother Norma Munoz (Norma) lived on one side of a converted garage; Munoz's grandmother lived on the other side. A wall separated the two units. Norma's sister Mercedes Munoz (Mercedes) and Mercedes's son Jesse Munoz (Jesse) lived in the main residence on the property.

One afternoon in 2024 Thomas Nessman, an acquaintance of the Munoz family, went to the unit Munoz's grandmother lived in to repair some holes in the wall. While Nessman was putting plywood over the holes, the tip of a knife appeared "several times" in the wall. Nessman and Mercedes (who was also inside the grandmother's unit) went to the yard to investigate. Moments later, Nessman saw Munoz holding a black plastic trash bag, which Munoz threw at Nessman. Nessman grabbed the bag and threw it back at Munoz, and Munoz sprayed Nessman in the face

2

with "bear spray."[1]  Referring to Munoz, Nessman said, "I'm going to kill that mother fucker."

Mercedes, who was standing behind Nessman, felt the spray on her face, particularly in her eyes, and fell to the ground. Mercedes testified the spray felt "like a burning."  Munoz pulled out a pellet gun, and Nessman felt "a bullet whizz[ ] right by" his ear.  Munoz pointed the gun at Jesse, who had come out of the main house "to try to record what was going on."  Munoz fired two shots at Jesse, and one of the pellets hit Jesse in the arm.

Los Angeles County Deputy Sheriff Justin Bleau and several other deputies responded to the scene.  The deputies went into the home and found two cannisters of pepper spray on a shelf in the living quarters Munoz and Norma occupied.  On the desk in the bedroom the deputies found other cannisters of pepper spray, along with two unloaded pepper spray round magazines that someone could use "for a pepper spray gun that would look like a firearm."  Deputy Bleau explained that, when a person shoots a pepper spray bullet, the bullet will explode when it comes in contact with the victim.

One of the deputies observed that Mercedes had multiple bruises and scratches on the side of her cheek and that Jesse had one or two bruises on his left forearm.  Nessman, who was "pouring water on his face," told the deputy that he had just been sprayed and could not see.  The deputy did not see any injuries on Norma or Munoz.  The deputies later recovered a pellet gun in the backyard.

---

[1]     A deputy sheriff later determined the spray was oleoresin capsicum, "a form of pepper spray."  (See *People v. Autterson* (1968) 261 Cal.App.2d 627, 630 [oleoresin capsicum is a "peppery-type substance"].)

3

B. *The People Charge Munoz with Crimes, and the Trial Court Grants His Request To Represent Himself*

The People charged Munoz with three counts of assault with a deadly weapon (§ 245, subd. (a)(1)),[2] and one misdemeanor count of using tear gas not in self-defense (§ 22810, subd. (g)(1)).[3] At the first hearing after his arraignment Munoz confirmed with the court that he signed a form titled "Advisement and Waiver of Right to Counsel (*Faretta* Waiver)"[4] and that he put his initials in "the appropriate boxes" on the form.

Munoz also answered questions from the court about whether he understood the risks and consequences of representing himself. The court asked Munoz whether he understood that he had certain rights (which the court listed); stated Munoz had been charged with "some serious crimes" that

---

[2]     Statutory references are to the Penal Code.

[3]     The People charged Norma with one count of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)).

[4]     Munoz placed his initials in the boxes on the form next to advisements about his constitutional rights; warnings about the dangers and disadvantages of representing himself; a notice he was giving up the opportunity to have an experienced professional attorney assist him in defending against the charges against him and, if convicted, in presenting any posttrial motions or sentencing options to the court; and an admonition that, by choosing to represent himself, he would be acting against the advice and recommendation of the court. Munoz wrote "20" in the space for his age and "hs dipLomA" in the space for the highest educational level attained. Munoz was 21 years old at the time of the trial.

were "considered strikes"; advised Munoz that he had the right to an attorney; and stated that, if Munoz wanted an attorney to represent him again, an attorney could represent him, but that it would "be very difficult" for a newly appointed attorney "to come up to speed" on the case and that it would be difficult for the attorney to be able to represent him "successfully." The court also asked Munoz if he understood he could "not abuse" the right to represent himself, which meant he could not "misbehave or cause any disruptions in the court." Munoz answered "Yes" to each of the court's questions. The court found Munoz was "literate," "fully informed" of his right to counsel, and "mentally capable" of representing himself. The court also found Munoz fully understood "the implications of waiving [his] right to be represented by counsel" and "voluntarily and rationally" waived that right. The court asked Munoz if he was prepared to proceed with the preliminary hearing, and Munoz said, "Yes."

C. *The Jury Convicts Munoz, and the Court Places Him on Formal Probation*

Munoz represented himself at all stages of the trial, and the jury found him guilty on all charges. The trial court suspended imposition of sentence and placed Munoz on formal probation for three years on various terms and conditions. Munoz timely appealed.

## DISCUSSION

Munoz argues "the trial court erred by allowing [him] to represent himself" (capitalization omitted), though he does not really explain how the court erred. Munoz does not argue that he

5

lacked the competence to knowingly or voluntarily waive his right to counsel or that he was not competent to represent himself at trial. But Munoz quotes language from two cases, *Faretta, supra*, 422 U.S. 806 and *Indiana v. Edwards* (2008) 554 U.S. 164, that suggests he may be making these arguments. To the extent Munoz argues that he lacked the competence to knowingly or voluntarily waive his right to counsel or that he was not competent to represent himself, neither argument has merit.

### A. *Applicable Law and Standard of Review*

"The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. [Citation.] A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently." (*People v. Wright* (2021) 12 Cal.5th 419, 435-436; see *Faretta, supra*, 422 U.S. at pp. 835-836; *People v. Best* (2020) 49 CalApp.5th 747, 756.) "The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069-1070; accord, *People v. Morelos* (2022) 13 Cal.5th 722, 735; *People v. Mickel* (2016) 2 Cal.5th 181, 205; *Best*, at p. 756.)

6

"'The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. [Citation.] The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced.'" (*People v. Welch* (1999) 20 Cal.4th 701, 733; accord, *People v. Best*, *supra*, 49 Cal.App.5th at p. 759; *People v. Silfa* (2001) 88 Cal.App.4th 1311, 1323.) The determination whether the defendant is competent to waive his or her right to counsel "must be made . . . under the same test that applies to competence to stand trial, that is, the defendant must have a "'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and . . . "a rational as well as factual understanding of the proceedings against him.'"" (*People v. Stewart* (2004) 33 Cal.4th 425, 513; see *Godinez v. Moran* (1993) 509 U.S. 389, 396, 399; *People v. Lightsey* (2012) 54 Cal.4th 668, 695; *Welch*, at p. 732.)

The trial court ""'is not concerned with the wisdom of [the] defendant's decision to represent himself, or with how well he can do so. The sole relevant question is whether the defendant has the mental capacity to knowingly waive counsel while realizing the probable risks and consequences of self-representation.'"" (*People v. Best*, *supra*, 49 Cal.App.5th at p. 757; see *Faretta*, *supra*, 422 U.S. at p. 836 [defendant's "technical legal knowledge . . . was not relevant to an assessment of his knowing exercise of the right to defend himself"]; *People v. Johnson* (2012) 53 Cal.4th 519, 531 ["A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides."]; *People v. Taylor*

(2009) 47 Cal.4th 850, 866 ["the likelihood or actuality of a poor performance by a defendant acting in propria persona" does not "defeat the federal self-representation right"]; *People v. Welch, supra*, 20 Cal.4th at p. 733 ["the trial court may not ascertain a defendant's competence to waive counsel by evaluating the *ability* to represent himself or herself"].)

On the issue whether the defendant is competent to represent himself or herself, the trial court "need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence. When a court doubts a defendant's competence to stand trial, it 'shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant.' [Citation.] Similarly, when it doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into *that* question." (*People v. Johnson, supra*, 53 Cal.4th at p. 530; see *People v. Mickel, supra*, 2 Cal.5th at p. 208 ["when evaluating a *Faretta* motion," a trial court need only inquire into a defendant's mental competence "where it has doubts about the defendant's competence"].)

Thus, "the standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*People v. Johnson, supra*, 53 Cal.4th at p. 530; see *Indiana v. Edwards, supra*, 554 U.S. at pp. 177-178 ["the Constitution permits States to insist upon representation by counsel for those competent

8

enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves"]; *People v. Orosco* (2022) 82 Cal.App.5th 348, 358-359 [same]; *People v. Gardner* (2014) 231 Cal.App.4th 945, 956 [same].) "We review a *Faretta* waiver de novo, examining the entire record to determine the validity of a defendant's waiver." (*People v. Morelos*, *supra*, 13 Cal.5th at p. 735; accord, *People v. Mickel*, *supra*, 2 Cal.5th at p. 205; see *People v. Koontz*, *supra*, 27 Cal.4th at p. 1070 ["we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel"].)

B.    *The Trial Court Did Not Err in Granting Munoz's Request To Represent Himself*

1.    *Munoz Was Competent To Waive His Right to Counsel*

"A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence by the party contending he or she is incompetent." (*People v. Blacksher* (2011) 52 Cal.4th 769, 797; see § 1369, subd. (c)(3); *Rodriguez v. Superior Court* (2023) 15 Cal.5th 472, 493; *McKneely v. Superior Court* (2023) 91 Cal.App.5th 1232, 1240.) Munoz does not argue he was incompetent to stand trial, and nothing in the record suggests he was. In fact, the trial court found there was no basis to conduct an inquiry under section 1368.[5] Because the standard

---

[5]    Section 1368 "'requires that criminal proceedings be suspended and competency proceedings be commenced if "a doubt

for determining a defendant's competency to waive counsel is the same as that for determining the competency to stand trial (see *People v. Stewart*, *supra*, 33 Cal.4th at p. 513), there was no basis for the trial court to find Munoz lacked competence to waive his right to counsel.

Indeed, there was ample evidence Munoz had the mental ability to "comprehend the nature and object of the proceedings." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 205.)  At his arraignment Munoz responded appropriately to the court's admonition regarding the conditions for releasing him on his own recognizance.  During a discussion with the court about the risks and consequences of self-representation, Munoz's responses confirmed he had the ability to understand the nature of the proceedings, assert his rights, and communicate with the court.  For example, after Norma answered a question (incorrectly) about the mental state required for different kinds of crimes, the following colloquy occurred:

> "The Court:  Do you know what the difference between a specific and general intent crime is?

---

arises in the mind of the judge" regarding the defendant's competence [citation] and defense counsel concurs.'" (*People v. Wycoff* (2021) 12 Cal.5th 58, 82; see § 1368, subds. (a)-(c).)  At a pretrial hearing the prosecutor expressed a doubt about Munoz's competency (after expressing a doubt about Norma's).  The trial court reviewed the preliminary hearing transcript, referred to the "strong conspiratorial nature of the questions," spoke to the bench officer who presided at the preliminary hearing, and concluded:  "I do not believe that [section] 1368 review is triggered by what I see."

"Munoz: Like kind of the same thing she [presumably referring to Norma] just said. Would you like me to say it too?

"The Court: Yeah, what is it?

"Munoz: Well, general is—

"The Court: Yeah.

"Munoz: General would be in the general area."

Though Munoz did not answer the question correctly, his knowledge of criminal law and procedure is irrelevant to whether he was competent to waive his right to counsel. (See *People v. Best*, *supra*, 49 Cal.App.5th at p. 760 ["We recognize that [the defendant] did not understand such concepts as specific intent and general intent, but her ignorance of legal procedure and language is not a basis to deny her the right to self-representation."].). Munoz showed he could listen attentively, think on his feet, and converse rationally with the court. (See *People v. Stewart*, *supra*, 33 Cal.4th at p. 517 [where the defendant "responded in an appropriate manner to questions posed to him, fully demonstrating his awareness of the circumstances he faced and the proceedings against him," the record supported the court's conclusion the defendant "was competent to waive his right to counsel"]; *People v. Silfa*, *supra*, 88 Cal.App.4th at p. 1322 [where "the court found that defendant was mentally competent and fully informed of his right to counsel" and "had demonstrated that he was literate and understood the dangers of self-representation," "[n]othing more was required of him in order to exercise his right of self-representation"]; see also *People v. Poplawski* (1994) 25 Cal.App.4th 881, 894-895 [trial court erred in revoking the defendant's right to represent himself where there was "no

11

evidence to support the conclusion that defendant was mentally incompetent and thus lacked an understanding of the nature of the proceedings against him"].)

### 2. *Munoz Was Competent To Represent Himself*

Munoz does not argue, and there was no evidence, he suffered from a mental illness (much less a severe mental illness) that rendered him incapable of carrying out the basic tasks needed to present his defense without the help of counsel. Thus, the court had no duty to inquire into Munoz's competence to represent himself. (See *People v. Mickel, supra,* 2 Cal.5th at pp. 208-209, 205 [where the trial court "had little reason to doubt defendant's mental competence," the court did not err in granting the defendant's request to represent himself without determining whether he "was sufficiently competent to conduct his own defense"]; *People v. Johnson, supra*, 53 Cal.4th at p. 530 [trial court needs to inquire into the defendant's mental competence only "if it is considering denying self-representation due to doubts about the defendant's mental competence"].) In the absence of evidence Munoz had any kind of severe mental illness, the court did not err in granting Munoz's request to represent himself. (See *Indiana v. Edwards, supra*, 554 U.S. at pp. 171, 178 [court may deny a request under *Faretta* where the defendant's "severe mental illness" renders the defendant incapable of conducting trial proceedings without counsel]; *Mickel*, at p. 207 [state courts "may only exercise the discretion to deny self-representation based on a defendant's mental state as permitted under *Edwards*"]; *Johnson*, at p. 531 [same]; *People v. Orosco, supra*, 82 Cal.App.5th at p. 360 [because there was no evidence the defendant "suffered from any mental illness—let alone a severe

12

one," denying him the right to represent himself under *Edwards* "'was simply off the table'"].)

The record in fact shows Munoz ably carried out the basic tasks of representing himself, at times rather well. For example, at the preliminary hearing Munoz cross-examined Mercedes by asking her questions to clarify her direct testimony and argued zealously (albeit unsuccessfully) for the court to allow him to ask her about a domestic violence restraining order to show she made inconsistent statements. Munoz cross-examined Jesse with questions that sought to elicit an admission Jesse intended to use force against Munoz to protect Mercedes and Nessman during the altercation. Munoz also adeptly rephrased one of his cross-examination questions after the court ruled the question called for hearsay but said it would allow the answer for impeachment.

During the trial Munoz asked the court for guidance on when the court would allow him to show his exhibits and how he should play video clips for the jury and, demonstrating his familiarity with courtroom protocols, asked for permission to "approach" a witness and "to publish" exhibits to the jury. Munoz also made timely and, at times, appropriate objections to the prosecutor's questions on direct examination of the People's witnesses. For example, in the middle of Mercedes's lengthy answer to one of the prosecutor's questions, Munoz objected, "Narrative," and the court sustained the objection. When the prosecutor asked Mercedes, "You got hit in the chest by somebody, right?" Munoz objected, "Leading." Munoz cross-examined Nessman by asking him whether he made certain statements on the day of the incident that could be construed as "a death threat" and introduced evidence to impeach Nessman. Munoz also demonstrated he understood the importance of the

13

record ("I wanted to give the D.A. some evidence. Can I do it on the record?") and the high burden of proof the People had to meet to prove the charges against him "beyond a reasonable doubt." Overall, Munoz was assertive, articulate, and alert, undermining any suggestion he did not have the mental capacity to carry out the basic tasks of defending himself. (See *People v. Mickel*, *supra*, 2 Cal.5th at pp. 208-209 [where the defendant filed appropriate motions, "demonstrated the ability to understand courtroom proceedings and apply rules of procedure," and engaged in all stages of the trial, "the trial court had no reason to doubt defendant's skill and ability" "to undertake the basic tasks necessary to represent himself"].)

Munoz points to his youth (20 or 21 years old), lack of higher education, and unsuccessful attempts to introduce evidence of self-defense. Munoz does not cite any authority for his suggestion the defendant must be a certain age or have a college degree before the court may allow the defendant to represent himself or herself. That Munoz did not know how to more skillfully introduce evidence that he used the pellet gun and pepper spray in self-defense showed he did not have legal training, which, as discussed, is not a basis for denying his request to represent himself. (See *People v. Mickel*, *supra*, 2 Cal.5th at p. 206 [The critical question "is not whether a self-represented defendant meets the standards of an attorney, or even whether a defendant is capable of conducting an effective defense. Instead, we have accepted that the cost of recognizing a criminal defendant's right to self-representation may result "'in detriment to the defendant, if not outright unfairness."'"].)

In a supplemental brief Munoz argues that voir dire "was not transcribed by a reporter" and that this deficiency "should

14

bolster the argument that the bench officer clearly erred by accepting the self-representation of [Munoz] due to the fact any competent attorney would have requested and preserved the bench officer's remarks, denials, and rejection on the record by demanding a transcript of the record." As discussed, however, the court does not hold the defendant to the standard of an attorney when ruling on a motion for self-representation.

Munoz unequivocally asserted his right to represent himself.[6] The court admonished him about the risks and consequences of doing so, and Munoz stated he understood the court's warnings. Nothing in the record indicates Munoz suffered from any kind of severe mental illness. Instead, the record showed Munoz had the ability to perform the basic tasks of defending himself through all stages of the trial. The trial court did not err in granting his request to represent himself.

---

[6] For the first time in his reply brief, Munoz asserts Norma "forced him" to represent himself. Munoz forfeited this argument. (See *People v. Mickel*, *supra*, 2 Cal.5th at p. 197 ["Ordinarily, we do not consider arguments raised for the first time in a reply brief."].) Munoz also does not cite any evidence Norma coerced or was "pushing" him to waive his right to counsel.

15

## DISPOSITION

The judgment is affirmed.


SEGAL, J.

We concur:


MARTINEZ, P. J.


STONE, J.