Filed 5/30/24  P. v. Lopez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICK VEDOL LOPEZ,<br><br>    Defendant and Appellant. | B323742<br><br>(Los Angeles County<br>Super. Ct. No. LA090054) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard H. Kirschner, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted defendant and appellant Nick Vedol Lopez of first degree murder (Pen. Code, § 187, subd. (a))[1] for killing his wife, Tanya Menchaca, by stabbing her 32 times. After a separate trial on prior convictions and sentencing factors in aggravation, the court sentenced Lopez to 85 years to life in prison. Lopez represented himself for almost all proceedings in the guilt phase of the trial, and he now contends the trial court erred by allowing him to do so despite doubts as to his competency. In addition, Lopez argues the trial court erred by failing to instruct the jury on the lesser included offense of voluntary manslaughter, by instructing the jury incorrectly regarding factors in aggravation, and by failing to determine his ability to pay before imposing fines, fees, and assessments. In addition, Lopez contends the prosecutor committed misconduct in a question she asked during voir dire. We affirm, as we explain below.

## FACTUAL BACKGROUND

In January 2019, Lopez moved into a home in North Hollywood where Menchaca lived with two adult daughters from a prior relationship, Selina and Ariana, and Selina's three young children. Lopez and Menchaca shared the master bedroom upstairs. Ariana slept in another bedroom down the hall, and Selina and her children shared a third bedroom. Selina testified that she did not know Lopez well, but that after he moved into the house, he and Menchaca spent almost all their time together.

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

Selina believed Lopez had some kind of control over Menchaca, and for that reason Selina preferred not to speak with Lopez.

At around 10:00 p.m. on the evening of February 22, 2019, Selina knocked on the door of her mother's bedroom, and her mother answered. Selina saw Lopez sitting at the edge of the bed, and nothing seemed out of the ordinary. Selina said that she had put her children to bed and that she was heading out and would be back home later. Menchaca told her to have a good night. Ariana was not at home that night, so when Selina left, Lopez and Menchaca were the only adults remaining in the house.

Records recovered from Lopez's phone showed that he attempted to call his son at 1:42 a.m. the following morning, and again at 1:43 a.m., but his son apparently did not answer. Surveillance footage from an apartment building next door captured a figure getting into Menchaca's silver Honda Civic and leaving the driveway of the home at 1:44 a.m. but showed no one else entering or leaving the house at around this time. Lopez made three more unsuccessful calls to his son between 1:46 and 1:47 a.m. At 1:51 a.m., Lopez called 911 from Menchaca's cell phone and told the dispatcher that someone had been stabbed at the address of the house where he lived with Menchaca.

Within five minutes of the 911 call, first responders from the fire department and Los Angeles Police Department (LAPD) arrived on the scene. Police officers found the security gate of the building open, and the front door unlocked. They saw no signs of forced entry. When the officers entered, they saw a substantial amount of blood in the kitchen and on the stairway leading upstairs. Officers entered Lopez and Menchaca's bedroom and discovered Menchaca's naked body upside down in a closet,

covered in blood. They found Selina's three children, still in bed, and escorted them out of the house. Paramedics attempted to render aid, but they almost immediately declared Menchaca dead.

Officers investigating the crime scene found the blade of an eight-inch butcher knife that had broken off its handle in the closet where Menchaca's body was discovered, along with a bent knife underneath Menchaca's body, and two more knives in the sink in the adjoining bathroom. On the kitchen counter downstairs they found two knife blocks, one with no knives in it, the other with a few knives missing.

A police officer called Selina the night of the murder to tell her that something had happened at her home. She returned home to find yellow crime-scene tape surrounding the house. Officers told Selina to go to the police station, where she was reunited with her children and learned that her mother was dead. She told a detective that her mother's car was missing, and that Lopez had likely gone to Las Vegas, where his adult son lived.

At around 8:30 a.m. the following morning, an off-duty sheriff's deputy saw Lopez walking on an on-ramp of the 210 Freeway in Azusa, which is in the direction one would head from the crime scene towards Las Vegas, with blood covering his hands and his clothing. The deputy made a U-turn to approach Lopez and tried to get his attention, but Lopez ran away. The deputy called 911. A California Highway Patrol (CHP) officer responded to the call and found Menchaca's vehicle parked nearby on the shoulder of the freeway, apparently abandoned. The CHP officer exited the freeway and encountered Lopez, walking on the street with blood covering his clothes and hands.

4

The officer asked Lopez what happened, and he said he had been jumped. The officer asked him if he knew where he was, and he said no.

The officer notified dispatch, and additional law enforcement personnel and paramedics arrived on the scene. Paramedics assessed Lopez but did not find any injuries apart from some cuts on his hands. Azusa police officers placed Lopez in handcuffs and accompanied him to a hospital.

The CHP officer returned to the abandoned vehicle and discovered a large amount of blood on the driver's side door and near the trunk. The officer ran the license plate and found it was registered to Menchaca.

An autopsy showed Menchaca suffered 32 stab wounds, including 30 on her back and two on her sides. Two of the wounds were fatal, and six more were potentially fatal. The nature of several of the wounds suggested they had been caused by a kitchen knife. Menchaca had also suffered a blunt-force injury to her head consistent with being slammed down on the ground or against a bed frame. The medical examiner who conducted the autopsy also found an abrasion on Menchaca's finger and a cut on her hand, both of which were consistent with defensive wounds. Criminalists tested the blood recovered from the knives they found in the bedroom and determined it contained DNA from both Menchaca and Lopez. They also conducted DNA tests on fingernail clippings from Menchaca's right hand, which showed DNA from both Lopez and Menchaca. This suggested Menchaca clawed at Lopez in self-defense. Investigators administered a sexual assault kit and recovered Lopez's semen from Menchaca's vagina and anus. The examiner who conducted the autopsy discovered a tear on Menchaca's anus.

There was no blood surrounding the injury, however, nor was it red, suggesting that it was the result of postmortem anal sex.

An LAPD detective concluded Menchaca had been killed in "a multi-phase attack," in which her attacker first struck in the bedroom, then went to the kitchen to retrieve additional knives, leaving a trail of blood up and down the stairs as he went. The attacker then returned to the bedroom and stabbed Menchaca again. Menchaca either went in the closet trying to flee her attacker, or the attacker moved her there.

## PRIOR PROCEEDINGS

An information charged Lopez with one count of murder (§ 187, subd. (a)) and alleged that he had suffered two prior serious or violent felony convictions for purposes of the Three Strikes law (§§ 667, subds. (b)–(j), 1170.12). The information also alleged several aggravating factors, including that the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, that Lopez was armed with or used a weapon, that the victim was particularly vulnerable, that Lopez took advantage of a position of trust and confidence to commit the offense, that Lopez had prior convictions that were numerous and of increasing seriousness, and that he showed a lack of remorse and committed a post-mortem sexual assault.

On May 22, 2019, prior to his preliminary hearing, Lopez completed a *Faretta v. California* (1975) 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (*Faretta*) waiver form and asserted his right to self-representation. The trial court appointed stand-by counsel to assist Lopez with jury selection and to be prepared to take over the case if Lopez's self-representation was revoked. On April 15, 2021, Lopez voluntarily relinquished his pro per status,

6

and his attorney filed a motion to suppress statements Lopez made during a police interrogation the day after the murder in which he admitted that he stabbed Menchaca. The trial court granted the motion on the ground that the detective violated Lopez's *Miranda*[2] rights by continuing to question Lopez after he requested an attorney.

In August 2021, shortly after the court granted the suppression motion, Lopez filed a *Marsden*[3] motion seeking to replace his appointed attorney. During the hearing on the motion, Lopez informed the court that he disagreed with his attorney's plan to defend him on the basis that he was under the influence[4] when he stabbed Menchaca, which Lopez described as a "guilty defense" that would "be admitting that I committed the crime." Lopez preferred to argue that the crime scene had been staged, and that Menchaca was still alive when the police arrived. Lopez also believed that the video of his interrogation the day after the murder had been "switched" from an original video where he "was barely speaking" to a new video showing a "total confession," which Lopez denied he made. Lopez complained that his attorney refused to submit reports from experts that, according to Lopez, showed the crime scene had been staged and that photographs of Menchaca's body showed

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

[3] *People v. Marsden* (1970) 2 Cal.3d 118.

[4] The doctor who treated Lopez at the hospital the morning after the murder found that he was intoxicated and had an altered psychiatric state. Lopez did not introduce this evidence during the trial.

7

she did not have rigor mortis, indicating that she did not die at the time the prosecution alleged. Lopez's attorney stated that his strategy would not require admitting that Lopez was guilty, because he would deny that Lopez formed the specific intent to kill, which is required for first degree murder. The trial court denied the *Marsden* motion, and Lopez once again asserted his right to represent himself.

After accepting Lopez's *Faretta* waiver, the court asked Lopez if he planned to proceed with a defense that he did not stab Menchaca, and that the police were responsible for killing her and staging the crime scene. Lopez confirmed that his defense was indeed that "I did not do that to my wife and . . . that she was alive at the crime scene." On the basis of this statement, the court declared a doubt as to Lopez's competency to proceed, and his stand-by attorney concurred. The mental health division of the superior court found Lopez competent to stand trial and returned him to the trial court, where proceedings resumed.

After a trial in which Lopez represented himself, made objections, cross-examined the prosecution's witnesses, called a witness of his own, and made a closing argument, the jury found Lopez guilty of first degree murder. Prior to the second phase of the trial, on aggravating factors and Lopez's prior convictions, Lopez again relinquished his self-represented status. The jury found the allegations true.

The trial court sentenced Lopez to an aggregate sentence of 85 years to life in prison. The sentence consisted of 25 years to life multiplied by three pursuant to the Three Strikes law (see §§ 667, subd. (e)(2)(A)(i), 1170.12, subd. (c)(2)(A)(i)), plus five years for each of his two prior serious felony convictions (see § 667, subd. (a)(1)).

## DISCUSSION

### A. The Trial Court Did Not Err by Failing to Instruct the Jury on Voluntary Manslaughter

Lopez contends the trial court erred by failing to instruct the jury on voluntary manslaughter on the theories of heat of passion and imperfect self-defense. We disagree, as there was no substantial evidence to support an instruction on either of these theories.

" 'Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)' [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation]." (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154, fn. omitted, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

"In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could

9

lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman, supra*, 19 Cal.4th at p. 162.)

In this case, there was no substantial evidence that Lopez killed either in a heat of passion or in imperfect self-defense. Lopez argues that the jury could "reasonably infer[ ] from the infliction of 32 wounds upon Menchaca that [Lopez]'s actions were the product of a volatile, frenzied, uncalculated attack produced in the heat of passion," but to reduce murder to manslaughter on the basis of heat of passion, it is not enough that the defendant acted in an extreme mental state. In addition, the " ' "heat of passion must be due to 'sufficient provocation' " ' " (*People v. Moye, supra*, 47 Cal.4th at p. 549) on the part of the victim "that . . . would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.* at p. 550.) There was no evidence at trial that Menchaca did anything to provoke Lopez.

Nor was there substantial evidence that Lopez acted in imperfect self-defense, that is, on the theory " ' " 'that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury.' " ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1226.) All of Menchaca's stab wounds were on her back and sides, not on the front of her body, as would be expected if Lopez stabbed her in self-defense. Lopez, for his part, suffered no

10

injuries in the attack other than relatively small cuts on his hands.  Furthermore, the "multi-phase" nature of the attack, in which Lopez apparently went downstairs to the kitchen to get more knives before returning to stab Menchaca, was inconsistent with even an unreasonable belief that he was in imminent danger from his physically much smaller wife.

## B.     The Trial Court Did Not Abuse Its Discretion by Allowing Lopez to Represent Himself

With the exception of a short period before trial, Lopez represented himself in all proceedings in this case through the end of the guilt phase of the trial.  He now contends that he was not competent to do so, and that the trial court erred by failing to revoke his self-represented status.  He points to statements he made prior to trial that, he claims, show he did not understand "that a crime comprises actus reus and mens rea components and that the prosecution must prove their joint operation beyond a reasonable doubt."  We are not persuaded.  A trial court may not terminate a defendant's self-representation for lack of knowledge of legal doctrine.  (*People v. Best* (2020) 49 Cal.App.5th 747, 758.) Instead, a trial court may overrule a defendant's decision to act as his own attorney only where "severe mental illness" renders the defendant incompetent.  (*Indiana v. Edwards* (2008) 554 U.S. 164, 178 [128 S.Ct. 2379, 171 L.Ed.2d 345] (*Edwards*).)

Neither the California Constitution nor the Penal Code includes a right to self-representation (*People v. Johnson* (2012) 53 Cal.4th 519, 526 (*Johnson*); *People v. Taylor* (2009) 47 Cal.4th 850, 872, fn. 8), but the United States Supreme Court in *Faretta* held that the Sixth Amendment guarantees "the right of an accused to conduct his own defense."  (*Faretta, supra,* 422 U.S. at p. 832.)  "[T]he right of self-representation is not absolute,"

11

however.  (*People v. Mickel* (2016) 2 Cal.5th 181, 206.)  In *Edwards*, *supra*, 554 U.S. 164, the Supreme Court recognized that a "gray area" (*id.* at p. 172) exists in which a criminal defendant meets the minimal requirements for competence to stand trial—that is, " 'a rational as well as factual understanding of the proceedings against him' and . . . '. . . sufficient present ability *to consult with his lawyer* with a reasonable degree of rational understanding' " (*id.* at p. 170, quoting *Dusky v. United States* (1960) 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824])—but is not competent to act as his own attorney at trial.  The court declined to adopt a specific standard a defendant must meet to assert his right to self-representation, concluding only "that the Constitution permits judges to take realistic account of the particular defendant's mental capacities" (*Edwards*, *supra*, at p. 177), and that "the Constitution permits [s]tates to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."  (*Id.* at p. 178.)

In *Johnson*, *supra*, 53 Cal.4th 519, our Supreme Court "accept[ed] the *Edwards* invitation" and held that California "trial courts may deny self-representation in those cases where *Edwards* permits such denial."  (*Id.* at p. 528.)  The court reasoned that state law already authorized courts to deny incompetent defendants self-representation, and "California courts should give effect to this California law when [they] can." (*Id.* at p. 526.)

The *Johnson* court considered several possible standards courts might apply in deciding whether a defendant was competent to represent himself.  One group of amici curiae

12

"urge[d] th[e] court to return to what they view as the pre-*Faretta* standard in California 'requiring that a defendant who wishes to represent himself demonstrate an understanding of the charges, defenses and punishments, and an ability to rationally communicate.' " (*Johnson*, *supra*, 53 Cal.4th at p. 529.) Another amicus brief proposed " 'a test for the "cognitive and communicative skills" involved in competently representing oneself: "Such skills are present where the accused: (1) possesses a reasonably accurate awareness of his situation, including not simply an appreciation of the charges against him and the range and nature of possible penalties, but also his own physical or mental infirmities, if any; (2) is able to understand and use relevant information rationally in order to fashion a response to the charges; and (3) can coherently communicate that response to the trier of fact." [Citation.]' " (*Ibid.*, quoting *People v. Taylor*, *supra*, 47 Cal.4th at p. 873.) The court described these proposals, among others, as "plausible," but rejected them because "we are constrained by the circumstance that what is permissible is only what *Edwards* permits, not what pre-*Faretta* California law permitted. In other words, because of federal constitutional constraints, in considering the defendant's mental state as a reason to deny self-representation, a California court may not exercise the discretion permitted under California law but solely that permitted in *Edwards*." (*Johnson*, *supra*, at p. 530.)

The court in *Johnson* then summarized the *Edwards* standard, instructing trial courts to consider "simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, *supra*, 53 Cal.4th at p. 530.) The court instructed trial courts to "apply this

13

standard cautiously" because "[c]riminal defendants still generally have a Sixth Amendment right to represent themselves." (*Id.* at p. 531.)  For this reason, a court "may deny self-representation only in those situations where *Edwards* permits it." (*Ibid.*)

Subsequent cases have reaffirmed that " ' "[s]evere mental illness" appears to be a condition precedent. . . .  Nothing in the [*Edwards*] opinion suggests that a court can deny a request for self-representation in the absence of this.' " (*People v. Orosco* (2022) 82 Cal.App.5th 348, 360, quoting *U.S. v. Berry* (7th Cir. 2009) 565 F.3d 385, 391.)  Thus, in *Orosco*, where the defendant appeared confused at his *Faretta* hearing and made errors in filling out his waiver form, the trial court lacked discretion to find him incompetent to represent himself because there was no evidence he suffered from a mental illness. (*Orosco*, *supra*, at pp. 360–361.)  Even in *People v. Mickel*, *supra*, 2 Cal.5th 181, where the "defendant held fringe political beliefs that inspired his murder of a police officer" (*id.* at p. 209), this did not justify the trial court to find him incompetent to represent himself.

To be sure, a defendant may have sufficiently severe mental illness to warrant denying self-representation even if he does not engage in "bizarre, noncompliant, and disruptive behavior." (*Johnson*, *supra*, 53 Cal.4th at p. 525)  In *People v. Gardner* (2014) 231 Cal.App.4th 945, there was no evidence of bad behavior by the defendant in court, but the trial court nevertheless denied his *Faretta* motion on the basis of a doctor's report diagnosing him with "an 'Expressive Language Disorder' that prevented him from coherently communicating with the court or a jury.  [The doctor] also reported that [the] defendant did not demonstrate 'the higher cognitive abilities necessary to

14

litigate his case in court.' In other words, [the] defendant did not have the ' "ability to play the significantly expanded role required for self-representation even if he [could] play the lesser role of represented defendant." ' " (*Gardner*, *supra*, at p. 960, quoting *Edwards, supra,* 554 U.S. at p. 176.) On this basis, the Court of Appeal "conclude[d] that the trial court did not abuse its discretion in denying [the] defendant's motion to represent himself." (*Gardner*, *supra*, at p. 960.)

In this case, there was no diagnosis of a mental illness that prevented Lopez from carrying out the basic tasks of self-representation. Lopez argues that his conduct during the *Marsden* hearing shows he was not competent to defend himself. In the hearing, Lopez objected to his attorney's plan to concede that he killed Menchaca, and to argue he was not guilty of first degree murder on the basis of intoxication. Lopez described his attorney's strategy as a "guilty defense," a statement we read not as confusion that Lopez thought his counsel was proposing to concede he committed first degree murder, but rather as disagreement with any concession that Lopez stabbed his wife because he insisted she was alive and unharmed when he last saw her. In any event, a "lack[ ] [of] knowledge of criminal law and courtroom procedure . . . is not a basis to deny the right to self-representation." (*People v. Best*, *supra*, 49 Cal.App.5th at p. 758.) A defendant has the "right to control his defense" (*People v. Mickel*, *supra*, 2 Cal.5th at p. 209), even if it means choosing a poor strategy or presenting no defense at all. (See *People v. Taylor*, *supra*, 47 Cal.4th at p. 866 ["Nor does the likelihood or

actuality of a poor performance by a defendant acting in propria persona defeat the federal self-representation right"].)[5]

Finally, Lopez notes that the trial court was concerned enough about his proposed defense strategy that it suspended proceedings in the case pending an investigation into his competency. Lopez does not note, however, that a doctor who examined him stated that "[h]e appeared very knowledgeable in courtroom proceedings," and that he "was clearly advocating for himself, and stated he would request the assistance of an attorney if needed, as he had done in the past. He did not display any overt signs of a mental illness that would impair his ability to rationally assist in his defense." Although the doctor was evaluating Lopez's competence to stand trial, there is no reason to believe she would have reached a different conclusion if she

---

[5] In support of his argument, Lopez cites two pre-*Faretta* cases, *People v. Floyd* (1970) 1 Cal.3d 694, 703–704, disapproved on another ground in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36, and *People v. Sharp* (1972) 7 Cal.3d 448, 462, where the Supreme Court affirmed the denial of requests by criminal defendants to represent themselves in part on the basis of their level of education and courtroom demeanor. But in *People v. Mickel, supra,* 2 Cal.5th 181, the court stated that "our pre-*Faretta* case law cannot be indiscriminately imported into a post-*Faretta* world. As we concluded in *Johnson*, California courts may only exercise the discretion permitted under *Edwards*, not the discretion our pre-*Faretta* case law reflected." (*Id.* at pp. 207–208.) The court in *Johnson* cited *Floyd* and *Sharp* but did not imply that these cases accurately reflected the standard for denying a defendant self-representation. (See *Johnson, supra,* 53 Cal.4th at p. 528.)

had evaluated his competence to represent himself.[6]  The trial court did not discuss the possibility of evaluating Lopez's competence to represent himself rather than his competence to stand trial, but "we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of [its] discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)

When reviewing a trial court's decision regarding whether to revoke a defendant's self-representation, "we must defer largely to the trial court's discretion.  [Citations.]  The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence.  [Citation.]  Such deference is especially appropriate when . . . the same judge has observed the defendant on numerous occasions." (*Johnson, supra*, 53 Cal.4th at p. 531.)  The court in *Johnson* also cautioned that under the Sixth Amendment, "[s]elf-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly.  A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides." (*Id.* at p. 531.)

In this case, the trial court observed Lopez for three years of litigation and described him as "a very intelligent man" who was "articulate, . . . reasonably well-versed in the law, and . . . always highly, highly prepared."  The court described an incident during cross-examination of a witness when Lopez "was so

---

[6] A trial court may order a psychological examination of a defendant's mental competence to represent himself, but need not do so routinely.  (*Johnson, supra*, 53 Cal.4th at p. 530.)

familiar with the record as it was contained in the discovery, that he was able to correct the police officer on the brand and the type of the camera that that police officer had used years ago." We see no basis for calling into question the court's decision to allow Lopez to continue representing himself.

### C. The Prosecutor's Statement During Voir Dire Was Not Prejudicial Misconduct

Lopez contends the prosecutor committed misconduct by commenting during jury selection on differences between the judicial systems of the United States and Iran. We conclude that Lopez forfeited the argument by failing to raise it before the trial court. The argument also fails on the merits because, even assuming the statement was improper, there is no reasonable probability it affected the jury's verdict.

During voir dire, the court asked a prospective juror about his response to one of the questions on the jury selection questionnaire regarding past experience with the criminal justice system, and the prospective juror described an incident during his childhood in Iran when a friend had been unjustly convicted of murder. The court responded, "We have a different system than the system in Iran." The prospective juror said he believed law enforcement dealt with DNA evidence similarly in the United States.

Later, the prosecutor questioned the prospective juror about this incident. The prosecutor said, "So you said the incident involving your friend happened in Iran, is that fair? I also grew up in Iran. [That's] part of why I'm a [district attorney] in America. Would you agree with me that law enforcement in Iran is very different than the laws in America?" The juror responded he believed that "police officer[s] and law enforcement

18

work the same" in both nations, and believed his prior experience would make him biased against the prosecution. The prosecutor moved to dismiss the prospective juror from the panel for cause, and the trial court granted the motion.

Lopez argues that the prosecutor's question, in contrasting the law enforcement and judicial systems in the United States and Iran, "amounted to an endorsement for the integrity of her office and the police investigation upon which its prosecutions rely." In Lopez's view, the prosecutor's question represented misconduct because it impermissibly referred to facts outside the record (see *People v. Bolton* (1979) 23 Cal.3d 208, 213) and "attempt[ed] to precondition the prospective jurors" (Code Civ. Proc., § 223, subd. (b)(3)) to find him guilty by inflating the prestige of the prosecutor's office.

The People argue that Lopez forfeited this argument by failing to object before the trial court, and we agree. " ' " 'To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm.' " ' [Citation.]" (*People v. Dworak* (2021) 11 Cal.5th 881, 909.) We see no reason that an admonition would have been insufficient in this case.

Lopez's claim also fails on the merits. " ' " 'Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' " ' [Citation.] Misconduct that falls short of a federal due process violation may nevertheless violate state law if it 'involves the use of deceptive or reprehensible methods to persuade the court or

19

jury.'  [Citation.]"  (*People v. Dworak*, *supra*, 11 Cal.5th at pp. 909–910.)  "Reversal of a judgment of conviction based on prosecutorial misconduct is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to [the] defendant would have occurred absent the misconduct."  (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386.)

At issue is a single statement by the prosecutor to prospective jurors that did not refer to Lopez personally or to the murder of Menchaca.  Even if we assume without deciding that the comparison of the justice systems of Iran and the United States was improper, it was an isolated comment made before the trial began, and it was of no significance in comparison with the vast amount of evidence produced at trial establishing Lopez's guilt.  The prosecutor's statement did not infect the trial with unfairness, and there is no reasonable probability that Lopez would have obtained a more favorable result in its absence.

## D.    Any Error in the Jury Instructions on Aggravating Factors Was Harmless

Lopez contends the trial court instructed the jury incorrectly in the second phase of the trial.  In its instruction on how the jury should interpret the allegations on aggravating factors, the court stated that "[w]ords and phrases not specifically defined in this instruction are to be applied using their ordinary, everyday meaning."  In Lopez's view, the aggravating factors alleged in this case involved fine distinctions that the jury might not understand from ordinary use, such as the difference between violence and viciousness.  (See *People v. Reed* (1984) 157 Cal.App.3d 489, 492.)  Lopez argues that the instructions were also defective because the court did not inform the jury that "[t]he

20

essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110.)  Lopez's attorney, who represented him for this portion of the trial, did not object to the instructions on these grounds.  In March 2023, after Lopez's trial concluded, the Judicial Council of California issued new CALCRIM pattern jury instructions addressing the issues Lopez raises here.  (See CALCRIM Nos. 3224, 3225, 3233.)

We need not decide whether the trial court erred by failing to instruct the jury in the manner Lopez proposes, nor whether Lopez forfeited the argument by failing to object to the instructions before the trial court (see *People v. Lewis* (2001) 26 Cal.4th 334, 380 [where a defendant fails to request further amplification or explanation of a jury instruction, the claim is forfeited on appeal]) because any error was harmless under any standard of review.  As the People point out, this case did not involve a determinate sentence, where a jury finding of at least one aggravating factor is required for the court to impose a high-term sentence.  (See § 1170, subd. (b)(2).)  Instead, the jury convicted Lopez of first degree murder, which (in the absence of a special-circumstance finding) allows for only one sentence, 25 years to life, regardless of whether the jury found any aggravating factors.  (See § 190, subd. (a).)

Lopez argues the aggravating factors were nonetheless relevant because the trial court relied on them as justification for denying his motion pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 to strike one of the prior offenses for purposes of sentencing.  But "a *Romero* motion . . . requires the sentencing court to utilize a different legal standard with a different presumption than . . . applie[s] under . . . section

21

1170. . . . In ruling on a *Romero* motion, the court must consider whether 'the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*People v. Salazar* (2023) 15 Cal.5th 416, 428.) The consideration of aggravating and mitigating circumstances, which is mandatory for choosing a determinate sentence, is not directly relevant to a *Romero* motion, and the trial court's decision on a *Romero* motion "tells us little about what it would have done if given the opportunity to exercise its discretion on another sentencing issue under . . . section 1170." (*Salazar*, *supra*, at p. 429.)

In this case, although the trial court cited the aggravating factors found by the jury, it is clear from the transcript that the court based its decision to deny the *Romero* motion on its own evaluation of Lopez's conduct, not the jury's findings. The court noted that Lopez "has shown absolutely no remorse, no acceptance of responsibility," that he and Menchaca "were basically alone in the house at the time of the murder," and that "[t]his victim was particularly vulnerable. She was a slightly built woman. [Lopez] outweighed her by close to 100 pounds." The court concluded that "there is absolutely nothing in the record pertaining to [Lopez]'s background and character or prospects that would militate against the application of the Three Strikes law in this case. The Three Strikes law is appropriate in this case." The court decided to impose "the maximum sentence permitted under the law," and nothing about the jury instructions relating to aggravating factors made any difference to that determination.

22

**E.    The Trial Court Did Not Err in Failing to Determine Lopez's Ability to Pay before Imposing Fines**

At the sentencing hearing, the trial court imposed a $30 criminal conviction assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $10,000 restitution fine (§ 1202.4).  Lopez contends under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1168–1172 that the trial court violated his due process rights by imposing the fines and fees without considering whether he would be able to pay them.

In *Dueñas*, the court held that "imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*People v. Dueñas*, *supra*, 30 Cal.App.5th at p. 1168, fn. omitted.) In addition, to avoid constitutional questions regarding the propriety of imposing restitution fines that might place a much greater burden on indigent defendants than on others, the court held that when a trial court sentences an indigent defendant, "the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine."  (*Id.* at p. 1172.)  Subsequent cases have diverged on whether the court's analysis in *Dueñas* was correct (compare *People v. Kopp* (2019) 38 Cal.App.5th 47, 95 [agreeing in part with the *Dueñas* analysis], review granted Nov. 13, 2019, S257844, with *People v. Petri* (2020) 45 Cal.App.5th 82, 90–92 [rejecting *Dueñas*]), "and the issue is currently before the California Supreme Court" (*Petri*, *supra*, at p. 90).

We conclude that Lopez forfeited his challenge to the fines by failing to object before the trial court.  In cases where a sentencing hearing took place before *Dueñas*, some courts have

23

held that a defendant's failure to object to the imposition of fines and assessments is excused because *Dueñas* was not foreseeable, and it would have appeared futile to make an objection. (See, e.g., *People v. Jones* (2019) 36 Cal.App.5th 1028, 1033, *People v. Johnson* (2019) 35 Cal.App.5th 134, 138; but see *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 [forfeiture doctrine applied].) In this case, however, the sentencing hearing took place three years after *Dueñas*, and there was no reason for Lopez to believe it would have been futile to challenge the imposition of the fines. Furthermore, the trial court imposed a restitution fine of $10,000, the maximum allowed by law. (See § 1202.4, subd. (b)(1).) Although section 1202.4 bars trial courts from waiving the restitution fine on the basis of the defendant's inability to pay, it allows courts to consider ability to pay as a reason to reduce the fine below the maximum. (See *Frandsen*, *supra*, at pp. 1153–1154.) Thus, if Lopez believed he could not pay the restitution fine, he did not need *Dueñas* to give him permission to challenge it.

Even if we were to overlook Lopez's forfeiture of this issue, we disagree with Lopez on the merits. As we explained in detail in *People v. Caceres* (2019) 39 Cal.App.5th 917, 926–929, the imposition of fees and restitution fines does not ordinarily implicate due process or require trial courts in all cases to determine a defendant's ability to pay before imposing them. Nothing about Lopez's case suggests that it involves the "extreme facts" (see *id.* at p. 923) in which due process claims might be involved.

24

## DISPOSITION

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

CHANEY, J.

BENDIX, Acting P. J.